UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:09 CR 679 HEA/DDN |
| | ) | |
| KATHERINE A. MOCK and | ) | |
| ELAIN KAY YOUNG, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**
**REGARDING MOTIONS TO SUPPRESS EVIDENCE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). A pretrial motion hearing was held on October 21 and 22, 2010. A transcript of the hearing has been filed. (Doc. 166, 167, 167-1.) Post-hearing memoranda, including a written stipulation of facts, have been filed.

This Report and Recommendation[1] considers:

(1)  the motions of defendant Katherine A. Mock to suppress statements and physical evidence (Docs. 19 oral, 96, 97);

(2)  the motions of defendant Elain Kay Young to suppress statements and physical evidence (Docs. 29 oral, 98, 175); and

(3)  the motions of the government for a determination by the court of the admissibility or not of any arguably suppressible evidence (Docs. 20 oral, 30 oral).


**MOTIONS TO SUPPRESS EVIDENCE**

Both defendants have moved to suppress statements and physical evidence. From the evidence adduced at the pretrial hearing, the court makes the following findings of fact and conclusions of law:

---

[1] On March 14, 2011, the undersigned filed a Report and Recommendation that considered (1) the motion of defendant Katherine A. Mock to sever co-defendants for separate trials (Doc. 95); and (2) the motions of defendant Elain Kay Young (a) to sever co-defendants for separate trials (Doc. 90); (b) to dismiss the indictment (Doc. 99); (c) to strike surplusage from the indictment (Doc. 100); and (d) for an order directing the government to choose its theory of prosecution (Doc. 101). (Doc. 201.)

**FINDINGS OF FACT**

**March 23, 2006**

1.    During the early morning hours of March 23, 2006, Katherine A. Mock and Elain Kay Young together made a 911 emergency phone call to police from the farm property Young and her husband Melvin Griesbauer owned on Penny Royal Road in a rural area of Novinger County, Missouri (Young property).  Young and Mock made the call from the location of Griesbauer's body near a barn.  Law enforcement officers, including Adair County Chief Deputy Sheriff Larry Logston were dispatched to the scene.  The Young property included a residence building, a barn, and other outbuildings.

2.    Deputy Logston arrived at approximately 3:02 a.m.  He went to the barn area where Griesbauer's body lay; Griesbauer had been shot to death.  Also present at the scene were Sheriff's Deputies Tracy Salsberry and Brian Burns, Adair County Sheriff Leonard Clark,[2] and two Adair County ambulance personnel.  At the very entrance to the Young property, the police set up a law enforcement log sheet (Doc. 177-9, Def. Young Ex. 1), where officers investigating the scene recorded the time they arrived at the scene, before they proceeded further onto the property; on this sheet they also recorded the times they left.[3]  When Dep. Logston signed in, other officers had arrived and were discussing the scene.  A lever action rifle with a live round in the chamber was found on the ground next to the body.  The officers developed a tentative opinion that the death was a homicide and not a suicide.

3.    Deputy Logston and Sheriff Clark walked from the barn area, where the body lay, to the residence, about 100 yards from the barn.  They knocked on the front door and Kim Young, daughter-in-law of Elain Kay Young, opened the door.  Sheriff Clark offered his condolences to Kim and told her they needed to talk about what had happened.  She allowed them to enter the residence.

4.    Other officers were already inside the residence, as were Katherine Mock, Elain Kay Young, Elain's son Jared Young, and Jared's

---

[2]Sheriff Clark arrived at the property a few minutes before Deputy Logston.  Clark handwrote notes of some facts of the investigation. (Doc. 177-10, Def. Young Ex. 2.)

[3]Officer Salsberry was the first to arrive on the scene, at 2:11 a.m.  Officer Burns arrived shortly thereafter, at 2:14 a.m.

wife Kim.  Sheriff Clark already knew the Young family, including Elain and her mother.  He had not previously met Katherine Mock.  The family members were visibly upset and emotional.  Elain was crying and wiping tears from her face.  Sheriff Clark extended his sympathy to Elain Young for the death of her husband.

5.    The officers decided to interview Mock and Young separately, because they had discovered Griesbauer's body together, made the 911 phone call together, and the officers suspected he had been killed.[4]  They suspected Katherine Mock or Elain Kay Young, or both of them, were involved in the killing.  Before Mock and Young were interviewed, Sheriff Clark never told them they were not suspects in the case.

## Interview of Katherine Mock

6.    Deputy Logston, who was dressed in civilian clothes, asked Katherine Mock to step outside the residence to speak with him.  She readily did so.  Because the weather was cold, they entered his police patrol car; she sat in the front passenger seat and he in the driver's.  She was not handcuffed.  Before he began his interview, Logston took an audio recorder from his pocket and placed it on the dashboard in Mock's view.  Without telling her he was going to record the interview, he turned the recorder on.[5]

7.    The first thing he did in the interview was to ask her to identify herself and she did so.  He asked her questions and she responded and made oral statements.  During the interview, Mock told Logston that, because she takes pain medication that makes her sleepy, she goes to bed early in the evening.

8.    During this interview, Deputy Logston did not advise her of her Miranda rights.  She was not told she was in custody, under arrest, or could not leave.  She knew what they were talking about, her statements were logical and responsive to his questions, and she appeared to want to answer his questions and provide information.  He did not

---

[4]Mock and Elain Young were together at Griesbauer's body when the 911 call was made.

[5]However, due to a low battery, which he discovered later in the day in the office, only some of Mock's statements in the police car were recorded.

-3-

coerce her in any way to speak with him.  He did not draw his weapon during the interview.

9.  After Deputy Logston finished questioning Katherine Mock, and while they were still in the patrol car, he asked her to make a written statement.  He did not coerce her in any way to do so and she did not object to this.  She then willingly handwrote a statement on a witness statement form.  The form did not contain a statement of the <u>Miranda</u> rights.  (Doc. 177, Gov. Ex. 1.)  He did not coach her in what to write.

10.  When she finished writing the statement, Deputy Logston and Ms. Mock walked back inside the residence.  Thereafter, Ms. Mock was allowed to leave the residence.  She was not arrested that day.  At no time that day was she told she was under arrest.  However, before she left the residence, Officer Lene seized her shoes as evidence.[6]

11.  While Katherine Mock was being interviewed by Dep. Logston outside in the police car, officers remained inside the residence and interviewed Elain Kay Young, Jared Young, and Kim Young.

<u>Interview of Elain Kay Young</u>

12.  Shortly before 4:00 a.m. on March 23, 2006, Missouri Highway Patrol Criminal Investigator Corporal Steve Wilhoit[7] arrived at the Young property.  Officers[8] told him that Sheriff Clark was inside the residence and he went immediately to speak with the sheriff.  He opened the front door and entered the residence on his own and met with Sheriff Clark.

---

[6]At the suppression hearing, counsel for the government and counsel for defendant Katherine Mock agreed that the seizure of her shoes was not being challenged by her.  (Doc. 167-1, Transcript at 238.)

[7]At that time, Cpl. Wilhoit had been a Missouri Highway Patrol officer for 10 years and before that a Kansas City police officer for 3 and 1/2 years.  He received training in the Missouri State Criminal Justice program, which included 120 hours of basic law enforcement at the police academy in Columbia, Missouri; he received 6 months training at the Kansas City police academy; and he received 6 months training at the Missouri State Highway Patrol Academy.

[8]By the time Cpl. Wilhoit arrived, as many as 17 law enforcement personnel, including the county prosecutor and his assistant, and some 8 police vehicles were on the Young property.  Some of these vehicles were marked as law enforcement, others not.  Some of the officers were in civilian clothes and the rest in uniform.

-4-

13.   Cpl. Wilhoit then proceeded to interview Ms. Young[9] at the large dining table[10] in the open dining area.  Sheriff Clark sat in on the interview and took notes.  Wilhoit was dressed in civilian clothes.  He first introduced himself to Ms. Young.  While Young was being interviewed inside the residence, Katherine Mock was being interviewed outside the residence in the police vehicle.

14.   At the beginning of the interview, Cpl. Wilhoit saw that Ms. Young was upset.  She was crying and wiping her face.  However, she appeared to be willing to speak with the officers.  She was not handcuffed, she was not told she was in custody, and she was not told she could not leave.  During the interview, Cpl. Wilhoit did not advise her of her Miranda rights.  Ms. Young did not object to law enforcement officers being inside her residence.  At no time during the interview was she coerced, threatened, or promised anything to get her to cooperate in the investigation.  At no time during the interview did Cpl. Wilhoit or Sheriff Clark draw a weapon.  She appeared to understand what was going on, what she was doing, and where she was.  Young cried and wiped her face throughout the interview.  However, her statements to the officer were coherent and articulate.  She appeared to want to speak with the officers and provide information.  The interview ended between 4:40 and 5:00 a.m.

15.   When Elain Young's interview ended, Highway Patrol Sgt. David Hall[11] asked Ms. Young for the clothes she was wearing when the body was found.  Ms. Young said she would go upstairs and change clothes and that the officers could have the clothes she had been wearing.  Sgt. Hall told Ms. Young she couldn't go upstairs to change her clothes but had to do so downstairs.[12]  So, Young's daughter-in-law Kim went upstairs and got

---

[9]Before this interview, Cpl. Wilhoit had not known Elain Kay Young.

[10]See Young Ex. 4 (large photo exhibit).

[11]Sgt. Hall, as the Unit Supervisor for the Missouri Division of Drug and Crime Control, was the supervisor of the law enforcement officers on the scene of the Griesbauer killing.  The state authorities had been called in by the Sheriff.

[12]Sgt. Hall would not let Ms. Young change her clothes upstairs for two reasons.  First, he was concerned for the safety of the officers.  The premises had not yet been secured for weapons.  And, second, he was concerned Ms. Young might destroy evidence if allowed to go upstairs by

-5-

her a change of clothes. Ms. Young changed her clothes in a downstairs bathroom and gave the ones she had been wearing to Sgt. Hall.[13]

16.   At no time on March 23, 2006, did either Elain Kay Young or Katherine A. Mock ask for a lawyer or ask whether one was needed.

17.   After their interviews, Elain Kay Young and Katherine Mock were not arrested. Around 5:00 a.m. they left the Young property and drove with Jared and Kim Young to Jared and Kim's residence on Billy Creek, approximately three miles away.

18.   While he was at the Young property, Sheriff Clark was phoned by his jail administrator who asked him to call Army National Guard Warrant Officer Hawes. He did so and Hawes told him he had heard about Griesbauer's death. Hawes told Clark that Griesbauer was a member of the Guard and carried a life insurance policy in the amount of $400,000. Hawes gave the Sheriff a fax number for requesting a copy of the policy. Sheriff Clark directed his jail administrator to do so.

<u>Buccal swab and hair samples</u>

19.   Later on March 23, Sheriff Clark and another officer went to the Billy Creek residence to obtain buccal swabs of saliva and hair samples from Elain Young and Katherine Mock, from which to derive their DNA. Sheriff Clark used pre-prepared Highway Patrol kits for this purpose. Among those present with Young and Mock was Gayle Craig.[14]

20.   Sheriff Clark told them he wanted samples of their saliva and hair to obtain their DNA for investigation. He did not tell them they were suspects in the Griesbauer killing. Both agreed to provide the samples. He took each separately into a room in the residence to review a consent form and to take the samples.

21.   Clark proceeded with Elain Young first. She signed the consent form at 4:37 p.m. and allowed Sheriff Clark to take samples of her saliva and her hair.

22.   Then, the sheriff had Katherine Mock enter the room and he followed the same procedure he used with Young. Mock signed a Consent

---

herself.

[13]Sgt. Hall also obtained from Katherine Mock the clothes she wore at the time the body was discovered.

[14](Doc. 166, Transcript at 279.)

Search Authorization form (Doc. 177-5, Gov. Ex. 6), after Sheriff Clark read it to her.  The form provided these statements of rights:

> 1.   You may refuse consent to a search and may demand that a search warrant [be] obtained prior to any search of the premises described below.
>
> 2.   If you consent to a search, anything of evidentiary value seized in the course of the search can and will be introduced into evidence in court against you.

The form then provided the following statement "I HEREBY CONSENT TO A SEARCH WITHOUT WARRANT BY OFFICERS OF THE ADAIR COUNTY SHERIFF'S DEPARTMENT:".  Then followed the Sheriff's handwritten description of the items to be seized: "Hair sample & Buccal swab of saliva of Kathy A. Mock".  Then followed two printed statements:

> I HEREBY AUTHORIZE THE SAID OFFICERS TO SEIZE ANY ARTICLE WHICH THEY MAY DEEM TO BE OF EVIDENTIARY VALUE.
>
> THIS STATEMENT IS SIGNED OF MY OWN FREE WILL WITHOUT ANY THREATS OR PROMISES HAVING BEEN MADE TO ME.

Then followed a printed signature block on which she signed "Kathy Mock." The form was dated March 23, 2006, at 4:50 p.m.  The signature was witnessed by Sheriff Clark.  (Doc. 177-5, Gov. Ex. 6.)  When she considered and signed this consent form, Katherine Mock understood what was going on and the consequences of consenting.  At no time did she indicate that she did not want to sign the form; and at no time did she indicate that she did not want the sheriff to take samples of her saliva and hair.

     23.   During the time he obtained the hair and saliva samples from Young and Mock, Sheriff Clark did not tell them that they had a right to an attorney or to consult with an attorney before signing the consent form.[15]

_____

     [15]In a letter dated April 16, 2009, sent to Jared and Kim Young, Elain Kay Young wrote:

> I remember I asked [Sheriff] Leonard [Clark] 2x [(two times)] eventually about needing lawyer[.]  Now [I] can't remember 2nd time.  1st was for DNA swab.  I should have refused[.] \ 2nd was at farm.  You were with me.  Leonard talking-??

(Doc. 177-7, Gov. Ex. 9, at 7.)  In a letter, whose envelope was

### First search warrant

24.    When Cpl. Wilhoit finished interviewing Elain Kay Young at the Young property, Sgt. Berry directed him to apply for a search warrant for the Young property.  Cpl. Wilhoit and a prosecutor who was on the scene drove to the prosecutor's office to prepare the application papers. After they left the Young property, Sgt. Berry directed that the residence be cleared of police personnel, and all police personnel left the residence to await the warrant.

25.    The prosecutor and Cpl. Wilhoit used standard procedures to draw up an application and affidavit for a warrant to search the residence, the many barns and outbuildings, and three motor vehicles on the Young property.  In each of the related search warrant documents they drafted, Wilhoit and the prosecutor included the following list of 8 categories of items to be seized:

> 1. Firearm ammunition; 2. Firearms; 3. All wash cloths and towels; 4. Blue denim coat possessed by Elain Kay Young; 5. Any and all personal letters and notes of Elain Kay Young and Melvin Bernard Griesbauer; 6. Any and all insurance policies held in the name of Elain Kay Young and/or Melvin Bernard Griesbauer; 7. Shoes; and 8. Boots.

---

postmarked September 14, 2009, written by Elain Kay Young to Kim and Jared Young, Elain stated:

> It's interesting–Joyce [Roberts] heard me ask Leonard & Wilhoit @ [(at)] farm if I needed an attorney & Gayle [Craig] heard me ask at your house when they did the DNA.  This will become an issue.

(Doc. 177-8, Gov. Ex. 10, at 2; Doc. 166, Transcript at 275-77.)

On September 24, 2009, FBI Special Agent Keith Kohne interviewed Kim and Jared Young.  They told him that Elain Young told them that she had asked Sheriff Clark twice on March 23, 2006, about whether she needed a lawyer, and each time Sheriff Clark responded that she was not a suspect. The undersigned finds that these September 24, 2009 statements by Kim and Jared Young are not as credible as the statements in Elain's two letters to them in which she said that her statements about her need for an attorney were made first when Sheriff Clark obtained the DNA samples later on March 23 and the second on March 24 when Sheriff Clark returned to the Young property.  The letters specifically indicate that Joyce Roberts was at the Young property on March 23 and that Gayle Craig was at the property on March 24, 2006.  And the information in Young's letters is corroborated by oral testimony at the suppression hearing. (Doc. 166, Transcript at 266-83; Finding of Fact 41.)

(Doc. 177-1, Gov. Ex. 2, Application for Search Warrant, Affidavit in Support of Application for Search Warrant, Search Warrant.) Categories 5 and 6, for such documents and insurance policies, were included as a standard procedure for such investigations.

26.    In support of his application, Cpl. Wilhoit submitted his written sworn affidavit to Adair County Associate Circuit Judge Kristie J. Swaim. In the affidavit, Wilhoit described what the law enforcement officers had learned. He stated that around 2:00 a.m. that morning the Adair County emergency 911 center received an emergency call about someone's friend's husband having a hole in his cheek from an apparent gun shot wound to the face. The affidavit stated that law enforcement responded and found the body of Melvin Bernard Griesbauer lying on the ground near a horse barn, 100 yards from the residence. The affidavit described the wound. The affidavit stated that a spent rifle cartridge was found inside a horse barn, 20 feet from the body. The officers found a lever action rifle lying next to the body with a live round in the chamber. The affidavit described Wilhoit's interview of Elain Kay Young, Griesbauer's spouse. Ms. Young stated that Griesbauer had been commuting to work in Iowa and arrived back home in Kirksville around 1:20 a.m. She picked him up at a convenience store in Kirksville and they arrived at the property at 1:30 a.m. Young's friend, Kathy Mock, also was staying at the residence. The affidavit stated that Young told Wilhoit that, shortly after arriving home, Griesbauer said he was going to check his dogs and traps in the barn area. She said that he left without a weapon and she went upstairs to put laundry away. She said she returned downstairs and heard a gun shot. She waited for lights to go on in the barn. She got Katherine Mock and the two of them walked to the barn. They noticed that the gate was open, which was unusual, and they found Griesbauer lying on the ground. Young stated that she knelt beside him and found no pulse. At some time while she was in that area she vomited. She returned to the residence, used wash cloths and towels to wipe her tears and wash her hands. The affidavit stated that Young told Wilhoit that she and Griesbauer were married in September 2004, that he had been in the Army National Guard, and that he had returned around September 2005 from a tour of duty in Iraq. Finally, the affidavit stated that the investigation revealed no suicide note and that Griesbauer's wound did not appear to be self-inflicted. Other than including insurance policies in the names of Young and Griesbauer as the items to be searched for, the

affidavit did not state any fact that indicated expressly the presence of a life insurance policy on the Young property. (<u>Id.</u>, Affidavit.)

27.   At 8:35 a.m. on March 23, 2006, Judge Swaim issued a search warrant for the Young property to search for the 8 items described in Cpl. Wilhoit's warrant application. (<u>Id.</u>, Search Warrant.)

28.   Cpl. Wilhoit arrived back at the Young property with the search warrant around 9:00 a.m.  Prior to the issuance of the search warrant, no officer searched the residence for evidence or went through Elain Young's or anyone's personal property in the residence.  While Wilhoit was gone to get the search warrant, no officer went inside the residence.  Upon Wilhoit's return, the search warrant was executed.  The officers seized many items, including a category of items described as "Financial Records." (<u>Id.</u>, Crime Scene/Search Warrant Inventory.)[16] The search of the property ended at approximately 5:45 p.m. on March 23.

29.   Shortly after he went on duty at 7:00 a.m. on March 23, 2006, in Milan, Missouri, Police Officer Rick Torres was dispatched to the Young property to participate in the investigation of Melvin Griesbauer's death.  He did not enter the Young residence until after the first search warrant was brought to the property for execution.  Officer Torres[17] participated in the execution of the search warrant by searching the upstairs master bedroom in the residence with another officer.  Torres remained on the scene until approximately 10:00 p.m.

### March 24, 2006
#### Second interview of Elain Kay Young

30.   On March 24, 2006, Elain Kay Young phoned Sheriff Clark and gave him information.  Whether before or during the later execution of a second search warrant at the Young property on March 24, 2006, Sheriff Clark and Cpl. Wilhoit went to the Young property and interviewed Elain.  Those present included Joyce Roberts.[18]   In a letter dated April 16,

---

[16]The documentary inventory of the items seized was provided to the state prosecuting attorney on March 27, 2006 and was filed with the circuit court.  (Doc. 177-1, Gov. Ex. 2, Return and Inventory, Certification of Court Records.)

[17]Officer Torres did not contribute any probable cause information for the issuance of the first search warrant.

[18](Doc. 166, Transcript at 280.)

-10-

2009, Young wrote that during this interview she mentioned the possibility of needing an attorney. (See Footnote 15.)

## Second search warrant

31. On March 24, 2006, Cpl. Wilhoit applied for a second search warrant for the Young property from Judge Swaim. The application sought a warrant to search for and seize computer hard drives and related items, personal financial records, loan applications, loan related emails, personal financial statements, and any financial records regarding the buying and selling of dogs. (Doc. 177-2, Gov. Ex. 3, Affidavit/Application for Search Warrant at 7.)

32. In his Affidavit/Application for Search Warrant, Cpl. Wilhoit stated that in the execution of the search warrant on March 23, 2006, three categories of financial documents were located "during the search of the residence": (a) a military life insurance policy,[19] dated August 16, 2004, on the life of the decedent, which provided a death benefit of

---

[19]In this regard, Cpl. Wilhoit's affidavit/application is incorrect. On March 23, 2006, in the execution of the first search warrant, the officers did not locate an actual life insurance policy. Instead, the officers found and seized a one-page "DEFENSE FINANCE AND ACCOUNTING SERVICE MILITARY LEAVE AND EARNINGS STATEMENT," issued to the decedent. (Doc. 177-3, Gov. Ex. 4.) The seizing officers observed that this document referred to "GROUP LIFE INSURANCE COVERAGE: $400,000." (Id.)

On March 23, 2006, Sheriff Clark's office phoned the U.S. Army National Guard office for a copy of all the life insurance policies on the life of the decedent and information about the beneficiaries. (Finding of Fact 18; Doc. 177-4, Gov. Ex. 5, Sheriff's Office telefaxed letter.) Later on March 23, 2006, the National Guard Office faxed to Sheriff Clark's office a cover page of the military life insurance policy issued on decedent's life. (Id., SERVICEMEN'S GROUP LIFE INSURANCE ELECTION AND CERTIFICATE.) This page stated, "By law, you are automatically insured for $250,000." The page left a box for the applicant to check to indicate more than $250,000.00 coverage. On this document the box was not filled in to indicate more than $250,000.00 coverage. (Id.) However, after receiving this telefaxed document, Cpl. Wilhoit obtained further information from the Army office that the death benefits on the decedent's life insurance policy had been increased to $400,000.00.

When Cpl. Wilhoit stated in the Affidavit/Application that "During the search of the residence [on March 23, 2006], the following financial documents were located: 1. A Military life insurance policy on the life of the deceased," he meant this information was obtained during the investigation of the case, not during the execution of the first search warrant.

$250,000.00 to Elain Kay Young as the primary beneficiary, with the benefit being increased to $400,000.00 near the end of 2005;[20] (b) financial records indicating that Elain Kay Young had about $70,000 in outstanding debt; and (c) emails to Young and Griesbauer concerning an outstanding loan.  The affidavit/application also described a statement by a person named Kim Gingerich, who had driven Griesbauer to work on March 22, 2006, that Griesbauer told Gingerich that he had received a phone call from Young, and that he had become upset with how the loan monies were to be used.  (Doc. 177-2, Gov. Ex. 3, Affidavit/Application for Search Warrant.)

      33.  On March 24, 2006, at 2:01 p.m., Judge Swaim issued a search warrant for the Young property to search for described computer related items.  (Id., Search Warrant.)

      34.  Around 3:00 p.m. on March 24, 2006, Cpl. Wilhoit and Adair County Sheriff Clark returned to the Young property to execute the second search warrant.  Elain Young was present and she allowed them inside the residence without objection.  The search warrant was executed and 17 categories of computer-related items were seized.  (Id., Return and Inventory.)

### March 26, 2006

      35.  On March 26, 2006, Missouri Highway Patrol Sgt. David Hall, who was also investigating Griesbauer's death, applied for a search warrant for the residence of Katherine Mock in Barry County, Missouri. He submitted to the Circuit Court of Barry County his sworn, written affidavit.  In his affidavit, captioned "Application and Affidavit in

---

      [20]Regarding the increase in the death benefit to be paid to primary beneficiary Elain Kay Young, the affidavit/application stated this information was acquired "upon checking with representatives of the Army National Guard."  (Doc. 177-2, Gov. Ex. 3, Affidavit/Application at 6.)  From the testimony of Sheriff Clark at the evidentiary hearing held on October 21, 2010, the court finds that during the early morning of March 23, 2006, while Sheriff Clark was at the Young property, he was called on the phone by his jail administrator who asked him to phone Army National Guard  Warrant Officer Hawes at xxx-5335.  Sheriff Clark did so and spoke with Hawes who told him that he had heard of "Mr. Griesbauer's accident."  Hawes then told Clark that Griesbauer carried a life insurance policy in the amount of $400,000.  Hawes gave the sheriff a fax number to request a copy of the policy.  Sheriff Clark directed his jail administrator to do so.  (Finding of Fact 18; Doc. 167-1, Transcript at 215-21.)

-12-

Support of Application for Search Warrant," Sgt. Hall described information learned in the Griesbauer investigation, beginning with the 911 emergency call to Adair County law enforcement around 2:00 a.m. on March 23, 2006.  This information included the circumstances of body lying on the ground near a horse barn, the rifle with the round in the chamber, and the spent cartridge shell found inside the horse barn 20 feet from the body.  The affidavit described information given by Elain Kay Young during her interview at 1:20 a.m. on March 23, 2006.  The affidavit described the personal and the dog breeding business relationships between Elain Kay Young and Katherine Mock.  The affidavit stated that Young and Mock kept in contact by cell phone, Mock's home phone, and Internet transmissions.  The affidavit described the information provided to law enforcement by Mock's son, Thomas Ponder, on March 25, 2006.  Ponder told law enforcement that, during the preceding 7 days, Katherine Mock asked him if he knew anyone willing to kill Young's husband, and told him that Young was willing to pay $10,000 to have her husband murdered.  The affidavit stated that Mock asked him to drive her 5 hours from her residence in Cassville, Missouri, to the Young residence on March 22 so that he could drive back in a vehicle Mock expected Young to give her; that Ponder handed over to law enforcement a gallon-size plastic bag of white Vicadin pills that he had received from Jean Ponder; that Ponder had received the pills from Mock; and that Young had given the pills to Katherine Mock to consume and then have Jean Ballard take her to the hospital, so she would not get into trouble.  The affidavit also stated that Ponder stated that Mock has a .22 caliber rifle in her residence to scare away animals, and that during the execution of the warrant at the Young residence in the search of Mock's vehicle, a bag containing a pistol and spent ammunition was found.  The affidavit also described information provided by Ballard about her relationship with Mock and Young.  Ballard described Mock's and Young's conversations during the early morning of March 24, Mock's giving Ballard the white pills, Ballard's giving the pills to Ponder, and Ballard's taking Mock to the hospital.  (Doc. 177-6, Gov. Ex. 8, Application and Affidavit in Support of Application for Search Warrant.)

    36.  On March 26, 2006, at 2:40 p.m., upon this affidavit and application, Barry County Associate Circuit Judge Michael D. Garrett issued a search warrant for Katherine Mock's property in Cassville, Missouri.  The search warrant authorized a search for firearms and

ammunition,[21] a prescription document or prescription bottle for Vicadin in Mock's name, white pills specifically described, gallon-size Ziploc plastic bags, documents indicating a business or personal relationship between Young and Mock, and a "[p]ersonal computer system attached to the internet utilized by Kathy Mock." The search warrant authorized certain investigative actions regarding the seizure of computer equipment and related items. (Id., Search Warrant.)

37.   The search warrant was executed on March 26, 2006; the search was conducted between 3:40 p.m. and 6:25 p.m. Law enforcement officers seized 11 categories of items. (Id., Crime Scene/Search Warrant Inventory.) A Wal-Mart receipt for the purchase of a 3-hole ski mask on March 22, 2006, was seized from Mock's purse; the officers knew that a 3-hole ski mask had been found by officers outside the Young residence when executing the first search warrant on March 23. The officers also seized computer materials including a zip-drive.

### March 17, 2008

38.   At the evidentiary hearing on the pending motions and by written post-hearing document (Doc. 165), counsel for the government and counsel for defendant Young agreed, and the undersigned so finds, that the following facts are true:

a.   At approximately 6:15 p.m. on March 17, 2008, Missouri State Highway Patrol Officer Nicholas Berry served an arrest warrant on Elain Kay Young for first degree murder and armed criminal action, relating to the death of her husband Melvin Griesbauer. The arrest was effected without opposition or incident in a traffic stop of Young's white Ford F-250 pickup truck as she was returning to her residence on Penny Royal Road. The officers approached the stopped vehicle and asked her to identify herself. She did so. Officer Berry told her she was under arrest for murder and directed her to step out of the vehicle. She did so and they handcuffed her.

b.   At that time Officer Wilhoit arrived with other officers. Wilhoit also advised her she was under arrest for murder and armed

---

[21]Firearms and ammunition were included in the application and the search warrant because, even though a weapon was found and seized on the Young property, there had not yet been laboratory analysis of the weapon and officers believed there could be other weapons involved.

-14-

criminal action.   The arrest warrant was read to her and Young was led away to a police vehicle.   At that time, Officer Berry searched the cab of Young's truck, intending to do so incident to Young's arrest.[22]   The search was begun in less than 3 minutes after Ms. Young was originally stopped and within a few seconds after she was led away in handcuffs. Officer Berry did not then believe that Young could have broken away and taken up a weapon in the truck cab.   Other than the murder investigation reason for her arrest, Officer Berry had no factually specific reason to think that evidence of the murder would be found in Young's truck.

   c.   When Officer Berry searched the cab of the truck, he did not expect the truck would be impounded and its contents inventoried. Instead, the officers released the truck to Young's boyfriend, Darryl Hamilton.   At that time, the officers did not believe that Darryl Hamilton posed a threat to them which would reasonably call for a search of the truck cab before the vehicle was released to him.

   d.   In his search of the truck's cab, Officer Berry found a large black purse, located within reach of the driver's seat where Young had been seated.   She was the only person in the vehicle when it was stopped.   Berry thought the purse was large enough to contain a weapon. He emptied the contents of the purse.   When he did so, a notebook containing loose papers, secured by a rubber band, fell out of the purse. Without manipulating the notebook or the papers, Officer Berry observed on the top page of the notebook the following hand printed words: "Use her drugged state to convince her she shot him.  Offered 10,000 to kill him.  Was turned down.  If I collaborate (sic) her story.  Bucks.  Sheriff (sic) here 3:30 p.m."  (Doc. 177-7, Gov. Ex. 9.)  Upon seeing these words, Officer Berry suspected this was evidence relating to the murder investigation.   He immediately seized the notebook and turned it over to Officer Linneman who was present and who took custody of the notebook.

---

[22]The parties stipulate that if called to testify about the arrest and search of the vehicle, Officer Berry would testify, and the court so finds, that he had been trained in the proper procedures for these kinds of searches.   He believed that this search of the truck cab, under these circumstances, was lawful, as the government argues in its legal memorandum, because the search occurred before the Supreme Court's decision in <u>Arizona v. Gant</u> in 2009.

**September 24, 2009**

39.    On September 24, 2009, Federal Bureau of Investigation Special Agent Keith Kohne interviewed Jared Young, the son of Elain Kay Young, as part of the investigation of the Griesbauer killing.  The interview occurred in St. Louis before Jared testified before the federal grand jury on that day.  During the pre-testimony interview, Agent Kohne and assistant United States Attorney Michael Reilly discussed with Jared the importance of telling them the truth and telling the truth when under oath before the grand jury.  During this interview, Jared told Agent Kohne and prosecutor Reilly that his mother, Elain Kay Young, had asked about having an attorney twice during the March 23, 2006 interview she had with Sheriff Clark and Cpl. Wilhoit.  Jared Young[23] told the agent that Sheriff Clark had responded to Elain that she was not a suspect and that the interview with Sheriff Clark and Cpl. Wilhoit continued after that.

40.    Also on September 24, 2009, Agent Kohne interviewed Kim Young. She had traveled to St. Louis from Minnesota in response to a federal grand jury subpoena.  During this interview, Agent Kohne and prosecutor Reilly discussed with her the importance of telling the truth and that she was then speaking with federal officials.  In this interview, Kim Young stated that during the March 23, 2006 interview her mother-in-law, Elain Kay Young, had with Sheriff Clark and Cpl. Wilhoit, Elain asked about her having an attorney and that in response Sheriff Clark told her that she was not a suspect.

41.    During these interviews of Jared and Kim Young, Agent Kohne learned that Elain had written them letters.  Agent Kohne obtained these letters from them, among which were two letters in which Elain stated that the first time she asked about whether she should have a lawyer was when the buccal swab was obtained by Sheriff Clark around 5:00 p.m. on March 23, 2006, after the initial interview of Elain that began at 4:00 a.m.  These letters also indicate that the second time Elain Young asked Sheriff Clark about whether she should have a lawyer was during her second interview which occurred on March 24, 2006.[24]

_____

[23]Agent Kohne testified that Jared Young and Melvin Griesbauer had a strained relationship.  Jared was not related to Griesbauer by blood and Jared did not like Griesbauer.

[24](Finding of Fact 23, footnote 15.)

-16-

**DISCUSSION**

The parties filed a joint statement describing the arguably suppressible evidence (Doc. 156).  The court takes up the identified issues seriatim.

**Elain Kay Young**

1.  Seizure of documents on March 23, 2006

Defendant Young argues that the seizure of 304 pages of documents on March 23, 2006, during the execution of the search warrant at 17631 Penny Royal Road, was unlawful.  She argues that Cpl. Wilhoit sought "[a]ny and all insurance policies held in the name of Elain Kay Young and/or Melvin Bernard Griesbauer" in the search warrant only after he and Sheriff Clark learned of a $400,000 life insurance policy which police discovered during a prior illegal search.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "Evidence obtained in violation of the Fourth Amendment may be subject to exclusion." United States v. Marasco, 487 F.3d 543, 547 (8th Cir. 2007).  The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." United States v. Villa-Gonzalez, 623 F.3d 526, 534 (8th Cir. 2010) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)).

In support of her contention that an illegal search preceded and yielded information for the application for the search warrant, defendant Young points to Sheriff Clark's March 23, 2006 handwritten investigation note sheet.  On this sheet, Sheriff Clark wrote "$400,000.00" on the right side of the page, on the same line as he wrote the name of Officer Torres, "Rick Torres". (Doc. 177-10, Young Ex. 2.)  At the bottom of the page, Sheriff Clark wrote Kim Young's name and telephone number.  (Id.) Defendant Young argues that, because the "$400,000.00" was written above Kim Young's name and telephone number and because Sheriff Clark could have written Kim Young's name and telephone number prior to the time Cpl. Wilhoit applied for the search warrant, Sheriff Clark and Cpl. Wilhoit

-17-

therefore knew about the life insurance policy before Cpl. Wilhoit applied for the search warrant.[25]

The evidence refutes defendant's argument that there was an illegal warrantless search before the first search warrant was issued. The undersigned has found that the Young residence was not searched during the time Cpl. Wilhoit was absent from the Young property to apply for the first search warrant on March 23, 2006. (Findings of Fact 24, 28, 29.) At the hearing, Cpl. Wilhoit, Sheriff Clark, Sgt. Hall, and Officer Torres each testified that there was no search before the search warrant was issued. (Doc. 166, Transcript at 262; Doc. 167, Transcript at 79-80; Doc. 167-1, Transcript at 160, 237-38.) While Sheriff Clark may have made the "$400,000.00" notation before writing Kim Young's name and telephone number at the bottom of his note sheet, there is no evidence beyond groundless speculation that this information was learned from an illegal search.

Instead, the court has found that Sheriff Clark obtained insurance policy information lawfully. Sheriff Clark's "$400,000.00" notation is consistent with his testimony that he learned of the life insurance policy, not through an illegal search of Young's residence, but from Army Warrant Officer Hawes. (Finding of Fact 32, footnotes 19 and 20). The sheriff recorded Hawes involvement in the investigation on his note sheet. (Doc. 177-10, Young Ex. 2.)

Nevertheless, the court still observes that the first search warrant issued on March 23, 2006, and its supporting papers, specifically authorized the search for and seizure of insurance policies, and that the factual probable cause affidavit submitted in support of the search warrant did not specifically mention insurance on the life of decedent Griesbauer. So, the court must determine whether the scope of the search warrant issued by the circuit court properly included insurance policies.

When reviewing the constitutionality of the issuance of a search warrant by another court, the reviewing court must decide whether the

_____

[25]In making her illegal search argument, defendant Young relies on the facts that Cpl. Wilhoit specifically mentioned the life insurance policy in the search warrant documents and that a window of time existed for officers to search her residence before the warrant was issued. While these facts are logically necessary for finding a prior illegal search occurred, they do not persuade that a prior illegal search actually occurred.

-18-

supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant. United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit. United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. at 238). See also, United States v. Grubbs, 547 U.S. 90, 95 (2006).

For this case, the issue becomes whether the facts described in the affidavit provided the issuing judge with a substantial basis for believing a fair probability existed that an insurance policy on the life of Melvin Griesbauer would be found in the Young property and that such would be evidence of the Griesbauer killing. The undersigned believes the answer to this question is Yes. The facts described by the Cpl. Wilhoit's affidavit indicate probable cause to believe that Griesbauer was killed on property on which he and his wife resided and that she and her friend located the body. At the least, the existence of insurance on Griesbauer's life could be evidence of a financial motive for killing him. Life insurance is such a prevalent economic fact in most people's lives that the issuing court, in the circumstances described by Wilhoit's affidavit, could reasonably find probable cause to believe it existed on Griesbauer's life, that it presented a financial motive for killing him, and that a life insurance policy on his life would be found in his and Young's residence. Therefore, Judge Swaim had a substantial basis for finding probable cause that a life insurance policy on Griesbauer's life would be found on the property to be searched.

Even if the affidavit did not support a finding of probable cause that an insurance policy on Griesbauer's life would be found in his and Young's residence, the seized documents should still not be suppressed. This is because the searching officers in objectively reasonably good faith relied on the search warrant to justify their search of the premises. United States v. Leon, 468 U.S. 897, 922 (1984). The specificity in the scope of items to be searched for, set forth on the face of the warrant, and the known probable cause facts for the issuance of the warrant did not reasonably suggest that the underlying affidavit was insufficient for the seizure of a life insurance policy on

-19-

Griesbauer's life or for the seizure of the other items.  United States v. Thurman, 625 F.3d 1053, 1056 (8th Cir. 2010).

The good faith exception to the exclusionary rule will not apply if: (1) the issuing judge was misled by false statements in the affidavit, (2) the issuing judge wholly abandoned her judicial role, (3) the affidavit in support of the warrant is so lacking in indicia or probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid.  United States v. Lindsey, 284 F.3d 874 (8th Cir.), cert. denied, 123 S. Ct. 334 (2002).  No evidentiary basis for any of these factors exist in this case.

The motion to suppress the 304 pages of documents seized on March 23, 2006 should be denied.

### 2.  Seizure of computer materials on March 24, 2006

Defendant Young argues that the seizure of the computer-related equipment and accessories on March 24, 2006, in the execution of the search warrant for the Young property at 17631 Penny Royal Road, was unlawful.  Young argues that the March 24, 2006 search warrant was illegally obtained because in his supporting affidavit Cpl. Wilhoit stated that a life insurance policy had been found at the house the previous day.

In his March 24, 2006 Affidavit/Application For Search Warrant, Cpl. Wilhoit stated that during a search of 17631 Penny Royal Road the previous day,

> A Military life insurance policy on the life of the deceased, Melvin Bernard Griesbauer, was located.  The policy was dated August 16, 2004, and indicated that upon the death of Melvin Bernard Griesbauer $250,000.00 would be paid to the primary beneficiary, Elain Kay Young.  That upon checking with representatives of the Army National Guard, the insurance amount payable was increased to $400,000.00 near the end of the year in 2005.  The primary beneficiary remained Elain Kay Young.

(Doc. 177-2 at 7; Finding of Fact 32, footnotes 19 and 20.)  Defendant Young argues that this information was illegally obtained as a result of an illegal search prior to Cpl. Wilhoit's search warrant application.

For the reasons discussed above, the court concludes that the officers did not conduct an illegal search prior to obtaining the first

search warrant and that the insurance policy found in the search was lawfully seized.

Although Cpl. Wilhoit's statement in the affidavit that a life insurance *policy* was located at the property was inaccurate, the officers instead lawfully discovered and seized a military pay record that expressly referred to the life insurance policy.  This led to Sheriff Clark's lawful request for and receipt via fax from the military of the life insurance policy (Finding of Fact 32, footnotes 19 and 20; Doc. 167 at 86-87; Doc. 177-4, Gov. Ex. 5).

"A search warrant is void and the fruits of the search must be suppressed if the defendant proves by a preponderance of the evidence that (1) the government knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit in support of the warrant, and (2) without the false statement, the affidavit does not establish probable cause." United States v. Hansel, 524 F.3d 841, 845 (8th Cir. 2008) (citing Franks v. Delaware, 438 U.S. 154, 155-56 (1978)).  See also United States v. Finley, 612 F.3d 998, 1002 (8th Cir. 2010).  "Mere negligence on the part of law enforcement officers does not satisfy [the first] requirement," United States v. Carpenter, 422 F.3d 738, 746 (8th Cir. 2005) (internal quotation omitted), and "[a]n inference of recklessness may be inferred only when the material omitted would have been 'clearly critical' to the finding of probable cause." United States v. DeLazaro, No. 09-2568, 2011 WL 476604, at *2 (8th Cir. Feb. 11, 2011) (per curiam) (internal quotation omitted).

There is no evidence that Cpl. Wilhoit deliberately or recklessly misstated that a life insurance policy had been seized.  Although the life insurance policy itself was not discovered during the search, the military pay record that referred to the life insurance policy was discovered (Finding of Fact 32, footnote 19), and this ultimately led officers to obtain the life insurance policy.  (Id. at footnote 20.) The inaccuracy in the affidavit was immaterial.

Further, even if the inaccuracy was deliberately included in the search warrant application, which the court does not find, the Fourth Amendment was not violated by the seizure of the computer materials, because the affidavit still established probable cause for their seizure. Cf. United States v. Muhlenbruch, --- F.3d ----, 2011 WL 536493, at *8 (8th Cir. Feb. 17, 2011) (no Fourth Amendment violation despite

-21-

deliberate inclusion of falsehood if the warrant application would still show probable cause after the falsehoods are "redacted or corrected"); United States v. Scott, 610 F.3d 1009, 1013 (8th Cir. 2010) (when information was intentionally or recklessly omitted from an affidavit, the court must determine whether "it would have been impossible to find probable cause if the omitted evidence had been included").

Therefore, the motion to suppress the evidence obtained from the March 24, 2006 seizure of computer related equipment and accessories should be denied.

### 3.  Seizure of the notebook on March 17, 2008

Defendant Young argues that the seizure of the notebook on March 17, 2008 during the incident of her arrest (Finding of Fact 38) was unlawful. Defendant Young argues that although the search of the cab of her truck and seizure of the notebook were legal at the time, the Supreme Court's holding in Arizona v. Gant, --- U.S. ----, 129 S.Ct. 1710 (2009), made this search illegal.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1969). "The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971).  One exception to the warrant requirement is the "automobile exception, which authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (internal quotation omitted).  Another exception is the search incident to a lawful arrest. Gant, 129 S.Ct. at 171.

In New York v. Belton, 453 U.S. 454 (1981), the Court held that when a police officer makes a lawful custodial arrest of an automobile's occupant, the Fourth Amendment allows the officer to search the vehicle passenger compartment "as a contemporaneous incident of arrest." Belton, 453 U.S. at 460.  It was "widely understood" that under Belton, a vehicle search incident to an arrest of a recent occupant was an exception to the warrant requirement "even if there [was] no possibility the arrestee

-22-

could gain access to the vehicle at the time of the search." <u>Gant</u>, 129 S.Ct. at 1718.

In 2009, the Supreme Court revisited its <u>Belton</u> holding in <u>Gant</u>. Under <u>Gant</u>, officers "may search a vehicle incident to a recent occupant's arrest only if [1] the arrestee is within reaching distance of the passenger compartment at the time of the search or [2] it is reasonable to believe the vehicle contains evidence of the offense of arrest." <u>Gant</u>, 129 S.Ct. at 1723. The Court clarified that "<u>Belton</u> does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." <u>Id.</u> at 1714.

At the time of Officer Berry's search, defendant Young had been handcuffed and led away from the vehicle, and thus posed no threat to officer safety. (Finding of Fact 38(b); Doc. 165 at ¶ 3.) Officer Berry had no specific reason to believe that evidence relating to the murder of Melvin Griesbauer, for which defendant Young had been arrested, would be found in her vehicle. (Finding of Fact 38(b); Doc. 165 at ¶ 7.) As a result, evidence obtained during the March 17, 2008 vehicle search by Officer Berry would be inadmissible under <u>Gant</u> today.

However, the disputed search occurred prior to <u>Gant</u>. At the time of the search, Officer Berry could and did rely in good faith on his training, which led him to believe that the search was legal. (Finding of Fact 38(b); Doc. 165 at ¶ 6.)

Neither the Supreme Court nor the Eighth Circuit have ruled on the admissibility of evidence obtained in pre-<u>Gant</u> searches and seizures which would be illegal under <u>Gant</u>. <u>Davis v. United States</u>, 131 S.Ct. 502 (2010) (granting certiorari), <u>United States v. Hrasky</u>, 567 F.3d 367, 369 (8th Cir. 2009) ("Expressing no view on whether good-faith reliance on <u>Belton</u> would justify an exception to the exclusionary rule if the argument is raised in another case . . . .").

The majority of circuits that have addressed the issue have held the evidence admissible, relying on the officers' good faith reliance on the established law at the time of the search. <u>United States v. Curtis</u>, --- F.3d ----, 2011 WL 846703 (5th Cir. Mar. 11, 2011); <u>United States v. Buford</u>, 632 F.3d 264, 275-77 (6th Cir. 2011); <u>United States v. McCane</u>, 573 F.3d 1037, 1045 (10th Cir. 2009), <u>cert. denied</u>, 130 S.Ct. 1686 (2010); <u>United States v. Davis</u>, 598 F.3d 1259, 1264 (11th Cir. 2010). <u>But see</u> <u>United States v. Gonzalez</u>, 578 F.3d 1130, 1132-33 (9th Cir.

-23-

2009).  Those district courts of this circuit that have addressed the issue have held similarly.  See United States v. Scroggins, No. 09-00060-01-CR-W-DW, 2010 WL 750057, at *4 (W.D. Mo. Feb. 26, 2010); United States v. Lee, No. 07-04050-01-CR-C-NKL, 2009 WL 3762404, at *2 (W.D. Mo. Nov. 10, 2009); United States v. Allison, 637 F. Supp. 2d 657, 672-74 (S.D. Iowa 2009).  These holdings are consistent with Gant's note that qualified immunity will shield officers from civil liability for unconstitutional vehicle searches conducted in "reasonable reliance" on pre-Gant vehicle search law which had been "widely accepted."  Gant, 129 S.Ct. at 1723 n.11.

Thus, the court concludes that although Officer Berry's search would have been illegal under Gant, the evidence should not be suppressed because he reasonably relied in good faith on the established case law at the time of the search and seizure.

The motion to suppress the notebook seized on March 17, 2008 should be denied.

### 4.  Statements made on March 23, 2006

Defendant Young argues that the statements she made to Cpl. Wilhoit and Sheriff Clark at her residence on March 23, 2006 should be suppressed.  Defendant Young argues that she was not read her Miranda rights, despite being in custody and interrogated, and that her statements were involuntary.

#### Custody

Miranda requires that law enforcement agents provide certain warnings before interrogating an individual who is in custody.  United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011); Miranda v. Arizona, 384 U.S. 436, 444, 461 (1966).  However, "[t]he requirements of Miranda are triggered only when a defendant is both in custody and being interrogated."  United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005).

When determining whether a defendant was in custody, the court must "consider the totality of the circumstances confronting the defendant at the time of the interview," and "determine whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest."  Muhlenbruch, 2011 WL 536493, at *3 (internal quotations omitted).  The court must focus on "objective

-24-

circumstances, not on subjective views of the participants." Id. The following non-exclusive factors are relevant to this determination:

> (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or deceptive stratagems were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

Id. at *3-4. The first three factors weigh against the existence of custody, while the last three factors weigh in favor of the existence of custody. United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003).

After considering the relevant facts, the court concludes that defendant Young was not in custody when she made her statement to the police during the March 23, 2006 interview. Police went to her home as the result of her and Mock's 911 emergency telephone call. (Finding of Fact 1.) About an hour after officers first arrived on the scene, Cpl. Wilhoit interviewed defendant Young to gather information. "Miranda warnings are not required for [g]eneral on-the-scene questioning as to facts surrounding a crime,' which does not present 'the compelling atmosphere inherent in the process of in-custody interrogation." United States v. Howard, 532 F.3d 755, 761 (8th Cir. 2008). Cpl. Wilhoit was wearing civilian clothes (Finding of Fact 13), and neither he nor Sheriff Clark, who sat in on the interview to take notes, drew their weapons during the interview. (Finding of Fact 14.) United States v. Cates, 251 F.3d 1164, 1167 (8th Cir. 2001). The interview took place at defendant Young's large dining table in the open dining area of her house. (Finding of Fact 13.) Wolk, 337 F.3d at 1007; United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985) ("while a person may be deemed to be in custody even in his own home, . . . such is not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation").

During the interview, defendant Young was not handcuffed or physically restrained in any way, and she was not told that she could not leave. (Finding of Fact 14.) United States v. LeBrun, 363 F.3d 715, 722-23 (8th Cir. 2004) (en banc). The interview lasted less than an hour. (Findings of Fact 12, 14.) Wolk, 337 F.3d at 1007-08 (an 80-minute interview was "not a marathon session designed to overcome [defendant's] will") (quoting Helmel, 769 F.2d at 1320). Although she

-25-

was upset, defendant Young was coherent, articulate, and did not object
to the interview; she wanted to speak with the authorities. (Finding of
Fact 14.) See United States v. Black Bear, 422 F.3d 658, 662-63 (8th
Cir. 2005) (defendant "voluntarily acquiesced to [officer's] requests to
respond to questions"); United States v. Galceran, 301 F.3d 927, 930 (8th
Cir. 2002) (defendant "indicated he wanted to speak with [the officers]"
and "tell the officers what had happened").

There is no evidence that the officers used strong-arm tactics, such
as yelling or threatening, or used any deceptive stratagems. Brown, 990
F.2d at 400. The atmosphere of the interview was not police dominated.
Although many officers were on the property (Finding of Fact 12, footnote
8), only two officers were present at the dining room table during her
interview. United States v. Axsom, 289 F.3d 496, 502-03 (8th Cir. 2002)
(interview by two agents in defendant's home was not police dominated,
despite contemporaneous search of the home by nine agents). At the
conclusion of the interview, defendant Young was not arrested. "Lack of
arrest is a very important factor weighing against custody." Galceran,
301 F.3d at 930.

Based on the above findings, the court concludes that defendant
Young was not in custody during the interview.

### Voluntariness

The Fifth Amendment "prohibits the introduction of involuntary
statements at trial." United States v. Bordeaux, 400 F.3d 548, 560 (8th
Cir. 2005). "Statements to law enforcement authorities are voluntary if
they are the product of an essentially free and unconstrained choice by
[their] maker." Vinton, 631 F.3d at 482 (internal citations omitted).
"A statement is not considered involuntary unless the police extorted it
from the accused by means of coercive activity." Id. "A statement is
involuntary when it was extracted by threats, violence, or express or
implied promises sufficient to overbear the defendant's will and
critically impair his capacity for self-determination." United States
v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011). Factors to consider when
determining voluntariness include: "the degree of police coercion, the
length of the interrogation, its location, its continuity, and the
defendant's maturity, education, physical condition, and mental
condition." Id. Courts must also consider "the failure of police to
advise the defendant of his rights to remain silent and to have counsel

-26-

present during the interrogation." United States v. Hambrick, 630 F.3d 742, 749 (8th Cir. 2011). The government bears the burden of establishing the voluntariness of a defendant's statements by a preponderance of the evidence. Boslau, 632 F.3d at 429.

The government has met its burden of proving that defendant Young's statement was voluntary. Although the officers did not advise her of her right to remain silent and to have counsel present during the interview, defendant Young wanted to speak with officers. (Finding of Fact 14.) United States v. Gaddy, 532 F.3d 783, 788-89 (8th Cir. 2008) (defendant said he wanted to speak with agents). The officers made no threats, were not physically or mentally abusive, and did not restrain defendant Young's movement during the interview. Boslau, 632 F.3d at 429. The officers did not use coercive tactics. Although she was upset and the interview took place early in the morning, defendant Young was coherent and articulate during the interview. Vinton, 631 F.3d at 482; United States v. Howard, 532 F.3d 755, 763 (8th Cir. 2008). The interview lasted less than an hour, and defendant Young was not in custody. Boslau, 632 F.3d at 429 (noting that the defendant was not in custody during the "comparatively brief" 43-minute interview); Hambrick, 630 F.3d at 749 (noting that "the duration of the interrogation was relatively brief, lasting just over an hour"). The interview took place at the dining room table in defendant Young's home. United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996).

Further, there is no evidence that defendant Young, who was 51 years old at the time of the interview,[26] has less than average intelligence, such that she did not understand her constitutional rights. LeBrun, 363 F.3d at 726. Nor did defendant Young display any "unique sensitivity that would indicate that the agents might overbear [her] will." Id. at 726-27. She already personally knew Sheriff Clark (Finding of Fact 14) and she called the police to provide additional information the next day (Finding of Fact 30).

Therefore, because defendant Young was not in custody during the March 23, 2006 interview and because her statements were given voluntarily, the motion to suppress her statements should be denied.

---

[26]The court takes judicial notice that Young was born on September 20, 1954. (Doc. 1-2 at 2; Fed. R. Evid. 201.)

-27-

**Katherine Mock**

<u>1.  Seizures of samples of her saliva and hair on March 23, 2006</u>

Defendant Mock argues that the seizures of the samples of her saliva (buccal swab) and hair on March 23, 2006 were unlawful.  Defendant Mock argues that she did not voluntarily consent to law enforcement officers obtaining these samples.

The taking of such items as samples of saliva and hair are subject to the constraints of the Fourth Amendment.  <u>Schmerber v. California</u>, 384 U.S. 757, 768 (1966); <u>United States v. Weir</u>, 657 F.2d 1005 (8th Cir. 1981); <u>United States v. Pool</u>, 621 F.3d 1213, 1217 (9th Cir. 2010); <u>United States v. Purdy</u>, 2005 WL 3465721 at *8 (D. Neb. 2005) (finding the manner in which DNA sample was collected violated Fourth Amendment).

"Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to a search is a well-recognized exception to the warrant requirement."  <u>United States v. Golinveaux</u>, 611 F.3d 956, 959 (8th Cir. 2010).  However, consent to search is valid only if it is voluntarily given, or "if the searching officer reasonably believes that the subject gave voluntary consent."  <u>United States v. Arreola</u>, 250 Fed. App'x 765, 767 (8th Cir. 2007) (per curiam).  The government bears the burden of proving the defendant voluntarily consented to the search.  <u>Golinveaux</u>, 611 F.3d at 959.

When evaluating the voluntariness of a consent to search, the court must look to the totality of the circumstances under which the consent was given.  <u>United States v. Jimenez</u>, 478 F.3d 929, 932 (8th Cir. 2007).  "The ultimate question is whether the individual's will ha[s] been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary."  <u>Vinton</u>, 631 F.3d at 482 (internal quotations omitted).  The court must consider the suspect's characteristics and the environmental characteristics.  <u>United States v. Griffith</u>, 533 F.3d 979, 984 (8th Cir. 2008).  Suspects' characteristics include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their <u>Miranda</u> rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

<u>Id.</u>  Environmental characteristics include:

> [W]hether the person who consented (1) was detained and
> questioned for a long or short time; (2) was threatened,
> physically intimidated, or punished by the police; (3) relied
> upon promises or misrepresentations made by the police; (4)
> was in custody or under arrest when the consent was given; (5)
> was in a public or secluded place; or (6) either objected to
> the search or stood by silently while the search occurred.

Id.

At the time she gave consent to seize samples of her saliva and hair, defendant Mock was 52 years old.[27]  She was able to answer the officers' questions appropriately. (Finding of Fact 22); United States v. Comstock, 531 F.3d 667, 677 (8th Cir. 2008).  No evidence indicated she was intoxicated or under the influence of drugs, or otherwise impaired at the time she consented to the seizure.  When she was asked to volunteer the samples, she was at Jared and Kim Young's home with defendant Young, Jared Young, and Kim Young.  See Id. (defendant voluntarily consented while his wife was present and while he was in his own home).  Defendant Mock was not detained or questioned, and was only briefly separated from the others when Sheriff Clark obtained her consent and took the saliva and hair samples. (Findings of Fact 21, 22); see Vinton, 631 F.3d at 482 (consent to search was voluntary where defendant was "unrestrained and rational when he consented to the searches, . . . and [] his consent to the search . . . was obtained after a five-minute conversation with a single officer in [defendant's] own home").

Only Sheriff Clark and a deputy went to obtain the samples. (Finding of Fact 19.)  "[T]he mere presence of two or three officers being armed with holstered firearms, in the absence of evidence of threats or intimidation, does not negate a defendant's consent." United States v. Barnum, 564 F.3d 964, 970 (8th Cir. 2009) (internal quotation omitted).  Defendant Mock was not threatened, physically intimidated, or punished, and signed the consent form stating that she gave her consent without any threats or promises having been made to her.  Comstock, 531 F.3d at 677 (noting that the defendant signed and "initialed the [consent] form to indicate officers had not made any 'promises, threats, force, or coercion' to procure his consent").  Defendant Mock was also not in custody when she consented.

---

[27]The court takes judicial notice that defendant Mock was born on December 26, 1953. (Doc. 1-2; Fed. R. Evid. 201.)

The Consent Search Authorization form which defendant Mock signed informed her that she could withhold her consent and that, by consenting to the search, anything seized during the search could be used against her in court. (Finding of Fact 22.) Sheriff Clark read the form aloud to her before she signed it. (Id.) Mock did not indicate she did not want to sign the form or that she did not want to give samples of her saliva and hair to Sheriff Clark.

Although defendant Mock was not read her Miranda rights before giving her consent (Finding of Fact 23), Miranda warnings "are not required to establish voluntariness." United States v. Arciniega, 569 F.3d 394, 399 (8th Cir. 2009). Given the language of the Consent Search Authorization form, which was also read aloud to her (Finding of Fact 22), defendant Mock was aware that she could decline to consent to giving the saliva and hair samples. United States v. Willie, 462 F.3d 892, 897 (8th Cir. 2006) (consent to search was voluntary despite lack of Miranda warnings because defendant was aware, based on his prior consent and refusal to consent to searches, of his right to refuse consent and the consequences of granting consent).

Mock argues that Sheriff Clark misled her into consenting to the seizure by telling her that investigators sought the samples to eliminate her as a suspect, when she was actually a suspect and investigators actually hoped to discover inculpatory evidence from her saliva and hair samples. Even assuming Sheriff Clark made this statement, ["m]isrepresentations about the nature of an investigation may be evidence of coercion. . . [and] can invalidate the consent to search if the consent was given in reliance upon the misrepresentation." United States v. Turpin, 707 F.2d 332, 334-35 (8th Cir. 1983).

However, the facts of this case indicate that Mock could not have been misled by any such statement. The consent form notified her that "anything of evidentiary value seized in the course of the search [could] and [would] be introduced into evidence in court against [her]." Finding of Fact 22.) It would be unreasonable for her to think, given the warning of the consent form and the circumstances of the investigation, that the samples could not be used to implicate her in the murder. See Turpin, 707 F.2d at 335 (consent to search voluntary where officers denied that defendant was a suspect despite actually considering him a suspect). The record is clear that Mock understood the consequences of consenting to the search and that she voluntarily consented to the

-30-

search.  United States v. Cedano-Medina, 366 F.3d 682, 685 (8th Cir. 2004).

Therefore, the motion to suppress defendant Mock's saliva and hair samples should be denied.

### 2.  Seizure of her shoes on March 23, 2006

Defendant Mock argues in her motion that on March 23, 2006, the Adair County Sheriff's Department seized her shoes without a warrant and without her consent.  At the hearing, counsel for the government stated that the parties agreed not to contest the seizure of the shoes. (Finding of Fact 10; Doc. 167-1 at 88.)

Therefore, the motion to suppress defendant Mock's shoes is moot.

### 3.  Seizure of physical items on March 26, 2006

Defendant Mock argues that the seizure of physical items including, but not limited to, firearms, ammunition, paper documents, computer equipment and accessories, and a Wal-Mart receipt from her residence on March 26, 2006 was unlawful.[28]  On that day officers of the Missouri Highway Patrol and the Barry County Sheriff's Office executed a search warrant for Katherine Mock's property in Cassville, Missouri.  (Finding of Fact 37.)

"[T]he Fourth Amendment requires that a search warrant describe and identify the items to be seized with particularity."  United States v. Cartier, 543 F.3d 442, 447 (8th Cir. 2008).  "To satisfy the particularity requirement, . . . the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized."  United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007).  When determining whether a search warrant identifies the items with sufficient particularity, the court must employ "a standard of 'practical accuracy' rather than a hypertechnical one."  Id. "The degree of specificity required will depend on the circumstances of

_____

[28]Although the parties dispute the severability of the search warrant, see United States v. Timley, 443 F.3d 615, 622 (8th Cir. 2006) ("[W]here the warrant is invalid only in part, the warrant is 'severable,' and items seized pursuant to valid portions of the warrant need not be suppressed"), because the court finds that the search warrant was sufficiently particular and supported by probable cause, the court need not sever portions of the search warrant.

the case and on the type of items involved." United States v. Sherman, 372 Fed. App'x 668, 675 (8th Cir. 2010). "A warrant naming only a generic class of items may suffice if the individual goods to be seized cannot be more precisely identified at the time that the warrant is issued." United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999).

The Fourth Amendment also requires that warrants be supported by probable cause. Illinois v. Gates, 462 U.S. 213, 238-39 (1983). Probable cause exists, if under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. In deciding whether there is probable cause to support a warrant, a judge may draw reasonable inferences from the totality of the circumstances. Summage, 481 F.3d at 1077-78.

### Firearms and Ammunition

In his Application and Affidavit in Support of Application for Search Warrant, Sgt. Hall made the following statements to support the search for and the seizures of firearms and firearm ammunition as evidence of the crime of conspiracy to commit murder: Melvin Griesbauer died from a gunshot wound to the face; a spent rifle cartridge was found approximately 20 feet from his body; a lever action rifle with a live round in its chamber was next to his body; defendant Mock propositioned her son to murder Melvin Griesbauer; defendant Mock owned a .22 caliber rifle; a search of defendant Mock's vehicle revealed a pistol and spent large caliber rifle ammunition; and, ultimately, that defendants Mock and Young conspired to kill Melvin Griesbauer. (Finding of Fact 35.)

Sgt. Hall's affidavit did not indicate that the rifle found next to Melvin Griesbauer's body was the murder weapon. Given the involvement of firearms described in the affidavit, the authorization to search for firearms and ammunition was not overbroad. See United States v. Mustafaa, 1999 WL 737760, at *5, 191 F.3d 457 (7th Cir. 1999) (unpublished table opinion) (holding search and seizure of "any and all firearms" sufficiently particular because "[the] description limited the seizure to one, easily-identifiable class of items").

Further, to the extent that authorization to search and seize all firearms and ammunition may have been overbroad, the firearms and ammunition would be admissible under the good faith exception of United States v. Leon, 468 U.S. at 920-21. The circumstances of the investigation known by the officers and the language of the search

-32-

warrant soundly establish that the officers reasonably relied upon the search warrant. See United States v. Jimenez, 205 Fed. App'x 656, 662 (5th Cir. 2006) (applying good faith exception to overbroad warrant seeking "all firearms and ammunition" despite probable cause to search for only handguns).

The motion to suppress the firearms and ammunition discovered during the March 26, 2006 search should be denied.

**Paper Documents**

The search warrant authorized the search and seizure of "[a]ny paperwork, documents, letters, [and] statements indicating a business or personal relationship between Kathy Mock and Elain Kay Young" that was "believed to be evidence of the commission of a crime of conspiracy to commit murder." Defendant Mock argues that this part of the warrant was overly broad, and that there was no probable cause to believe that the paperwork, documents, letters, and statements were related to the alleged crime.

Police can search for "mere evidence" of a crime, so long as there is "probable cause . . . to believe that the evidence sought will aid in a particular apprehension or conviction." Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 306-07 (1967); United States v. Fitzgerald, 724 F.2d 633, 641 n.1 (8th Cir. 1983) (Heaney, J., dissenting) (noting that the "police can search for 'mere evidence' of a crime if there is a nexus between the item to be seized and criminal behavior"). In his affidavit, Sgt. Hall detailed his findings regarding the events before, during, and after the commission of the alleged crime. (Finding of Fact 35.) Based on this information, there was sufficient probable cause to believe that paperwork, documents, letters, and statements indicating the relationship between Mock and Young existed in Mock's residence, and that such evidence would be relevant to the investigation. See United States v. Anderson, 879 F.2d 369, 378-79 (8th Cir. 1989) (evidence of co-conspirators' relationship is not only "relevant to a conspiracy charge," but "highly probative"). See also United States v. Krasaway, 881 F.2d 550, 553 (8th Cir. 1989) (upholding warrant for "[a]ddress and/or telephone books, papers and other items reflecting names, addresses, and telephone numbers of co-defendants or conspirators"); United States v. Vanichromanee, 742 F.2d 340, 347 (7th Cir. 1984) (upholding search warrant for "documents, papers, receipts, and other writings which [were]

-33-

evidence of a conspiracy to [import heroin]"); <u>In re Search Warrant Dated</u>
<u>July 4, 1977</u>, 572 F.2d 321, 328 n.4 (D.C. Cir. 1977) (discussing the
necessary breadth of search warrants for evidence in conspiracy
investigations, and noting that "[t]here is nothing in the nature of the
crime of conspiracy . . . that prevents a magistrate from issuing a
search warrant to seize evidence that such crime has been committed").
<u>Cf.</u> <u>United States v. Stefonek</u>, 179 F.3d 1030, 1033 (7th Cir. 1999)
(warrant seeking "evidence of crime" was overbroad).

Further, the officers reasonably relied in good faith on the
validity of the warrant, which was neither facially deficient, nor void
of probable cause. Thus, had the search warrant been defective in
authorizing the search and seizure of the paperwork, documents, letters,
and statements, such evidence would still not be subject to suppression.

Therefore, the motion to suppress the paperwork, documents, letters,
and statements seized on March 26, 2006 should be denied.

## Computer Equipment and Accessories

Defendant Mock challenges the search and seizure of her computer
equipment and accessories, arguing that the search warrant affidavit did
not establish probable cause that she possessed computer equipment and
accessories, or that her computer equipment and accessories were used in
furtherance of the alleged conspiracy. The search warrant authorized the
search and seizure of her "[p]ersonal computer system attached to the
internet" as evidence of the crime of conspiracy to commit murder.
(Finding of Fact 36.)

In his affidavit, Sgt. Hall stated that defendants Mock and Young
reportedly corresponded by cellular telephone, defendant Mock's home
telephone, and via electronic internet transmissions, in which they
conducted their dog business. (Finding of Fact 35.) Sgt. Hall further
explained that defendants Mock and Young were in the business of breeding
dogs. Based on this information, there was "a fair probability" that
defendant Mock possessed computer equipment and accessories, through
which she communicated with defendant Young. <u>Gates</u>, 462 U.S. at 238-39.

In addition, for the reasons discussed above, the search warrant was
sufficiently particular and was supported by probable cause in that it
authorized the search and seizure of defendant Mock's computer equipment
and accessories for the purpose of finding evidence of the crime of
conspiracy: evidence of defendants' relationship.

Therefore, the motion to suppress the seizure of the computer equipment and accessories should be denied.

### Wal-Mart Receipt

Defendant Mock argues that a receipt from Wal-Mart, indicating the purchase of a ski mask (Finding of Fact 37), which was discovered in her purse during the March 26, 2006 search should be suppressed.  She specifically argues that the search warrant did not authorize the seizure of the receipt or any similar item.

The search warrant did not specifically authorize the seizure of the receipt.  Instead it authorized the seizure of any written prescription for the medication Vicadin.  The government argues that the officers were authorized to examine the receipt document to see whether it was a prescription document authorized by the warrant.

"Police may seize, without a warrant, an item that is (1) in plain view (2) when it is observed from a lawful vantage point, (3) where the incriminating character of the item is immediately apparent." United States v. Banks, 514 F.3d 769, 773 (8th Cir. 2008).  "The third requirement, that the incriminating character of an item be immediately apparent, is satisfied when police have probable cause to associate the property with criminal activity." Id. (internal quotations omitted). "Ultimately, the standard by which a warrantless search and seizure is reviewed under the Fourth Amendment is reasonableness." Id.

At the time the officers discovered the ski mask receipt, they were lawfully on the premises executing the search warrant.  The officers had a lawful right to search defendant Mock's purse, and to examine the receipt, given the authorization in the search warrant to search for similarly sized objects, such as prescription documents. See United States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005).

The criminal nature of the receipt was also immediately apparent. (Finding of Fact 37.)  Officers may conduct a cursory reading of documents to determine whether they fall within the scope of the search warrant.  United States v. Williams, 592 F.3d 511, 519-20 (4th Cir. 2010); United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir. 1997); United States v. Heldt, 668 F.2d 1238, 1267 (D.C. Cir. 1981); United States v. Crouch, 648 F.2d 932, 933 (4th Cir. 1981) (per curiam).  Thus, the officers executing the warrant were permitted to briefly examine the receipt.  See Calloway, 116 F.3d at 1133 (permitting cursory reading of

-35-

bank receipts where search warrant authorized seizure of documents,
notes, and records).   After a cursory reading of the receipt, the
criminal implications were readily apparent.

    Therefore, the motion to suppress the receipt should be denied.

### 4.  Seizure of credit/debit card

    Defendant Mock argues in her motion that on April 11, 2006, the
Barry County Sheriff's Department obtained, without a warrant or her
consent, financial records, including a copy of the debit record for
Mastercard No. xxxx-xxxx-xxxx-0081, which had been issued to her by her
estranged husband, Ralph Mock.   At the hearing, counsel for the
government advised the court that the government did not intend to offer
this record into evidence at trial.   (Doc. 167 at 7.)

    Therefore, the motion to suppress these financial records is moot.

### 5. Statement made on March 23, 2006

    Defendant Mock argues that the statement she made to Deputy Sheriff
Larry Logston on March 23, 2006 should be suppressed.   Mock argues that
her statements were obtained without a knowing and intelligent waiver of
her _Miranda_ rights, were coerced and involuntary, were made pursuant to
questioning after she invoked her right to remain silent, were obtained
in exchange for illusory benefits, and were induced by the pressures and
mental stresses of prolonged incarceration.

    As previously noted, "[t]he requirements of _Miranda_ are triggered
only when a defendant is both in custody and being interrogated." _Head_,
407 F.3d at 928.  Therefore, the court must "consider the totality of the
circumstances confronting [defendant Mock] at the time of the interview,"
and "determine whether a reasonable person in [her] position would
consider [her] freedom of movement restricted to the degree associated
with formal arrest." _Muhlenbruch_, 2011 WL 536493, at *3 (internal
quotations omitted).  The court considers five non-exclusive factors in
making this determination. _Id._ at *3-4.

    After considering the facts involved, the court concludes that
defendant Mock was not in custody when she made her statements on March
23, 2006.  Police arrived at the scene in response to her and Young's 911
emergency telephone call.  (Finding of Fact 1.)  About an hour after
officers first arrived on the scene, Deputy Logston interviewed Mock to
gather information. _Howard_, 532 F.3d at 761 ("_Miranda_ warnings are not

-36-

required for [g]eneral on-the-scene questioning as to facts surrounding a crime"). Logston was wearing civilian clothes (Finding of Fact 6), and did not draw his weapon during the interview (Finding of Fact 8). <u>Cates</u>, 251 F.3d at 1167.

During the interview, defendant Mock was not handcuffed or physically restrained in any way (Finding of Fact 6), and was not told that she could not leave (Finding of Fact 8). <u>LeBrun</u>, 363 F.3d at 722. No evidence indicated that Deputy Logston used strong-arm tactics, such as yelling or threatening, or any deceptive stratagems. <u>Brown</u>, 990 F.2d at 400.

Defendant Mock argues that the interview was police dominated because she was not free to leave, because she was segregated from her friends, and because the interview was conducted in Deputy Logston's police car. However, the record shows that defendant Mock was free to leave, and did so at the conclusion of the interview. <u>Galceran</u>, 301 F.3d at 930 ("Lack of arrest is a very important factor weighing against custody."). Further, "<u>Miranda</u> warnings are not imposed because the questioning is conducted in a certain place, i.e., a patrol car, or because the person being questioned is suspected of having committed some offense." <u>United States v. Boucher</u>, 909 F.2d 1170, 1174 (8th Cir. 1990). <u>Cf.</u> <u>United States v. Urbina</u>, 431 F.3d 305, 309 (8th Cir. 2005) ("The interior of a police patrol car on the shoulder of a public highway during the day is not a secluded location.") Deputy Logston asked defendant Mock to speak with him outside, and asked her to speak with him in his police car for warmth and privacy; defendant Mock voluntarily agreed to accompany him. (Finding of Fact 6); <u>United States v. Lamy</u>, 521 F.3d 1257, 1264 (10th Cir. 2008) (defendant's voluntary decision to accompany police into their vehicle for questioning weighed against police domination). Moreover, defendant Mock sat in the passenger seat during the interview. <u>Id.</u> ("[Defendant's] position in the passenger seat of the vehicle suggests a lack of arrest."). Although there were many officers at the scene at the time of the questioning, only Deputy Logston was in the car with Mock during the interview. <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995).

There is also no evidence that defendant Mock's statements were involuntary, were given in response to questioning after she invoked her right to remain silent, were given in return for illusory benefits, or

-37-

were induced by the pressures and mental stresses of prolonged incarceration.

Therefore, the motion to suppress defendant Mock's March 23, 2006 statements should be denied.

#### EVIDENCE NOT TO BE OFFERED AT TRIAL AGAINST DEFENDANT MOCK

The government has agreed not to offer into evidence in its case-in-chief at trial against defendant Mock her proffer statement to Adair County Prosecutor Williams and law enforcement authorities in the presence of her attorney Kevin Locke on February 15, 2008. However, the government and defendant Mock have agreed that this statement was given voluntarily by Mock and that the government may use this statement at trial for the purposes of rebuttal or impeachment. (Doc. 156 at 2.)

The government and defendant Mock have agreed also that the government will not offer into evidence in its case-in-chief at trial her statement to Adair County Detention Officer Axsom during January 2007. (Id. at ¶ 3.)

Therefore, the motions to suppress this evidence are moot.

#### REPORT AND RECOMMENDATION

For the reasons set forth above,

**IT IS HEREBY RECOMMENDED** that the oral and written motions of defendant Elain Kay Young to suppress physical evidence and her statements (Docs. 29 oral, 98, 175) be denied.

**IT IS FURTHER RECOMMENDED** that the oral and written motions of defendant Katherine A. Mock to suppress physical evidence and statements (Docs. 19 oral, 96, 97) be denied.

**IT IS FURTHER RECOMMENDED** that the motions of the United States for a determination by the court of the admissibility of arguably suppressible evidence (Docs. 20 oral, 30 oral) be denied as moot.

The parties are advised that they have until close of business on April 7, 2011, to file written objections to this Report and Recommendation. The failure to file timely written objections will waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 24, 2011.

-38-